IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMIE'S LIMOUSINE SERVICE, INC., dba JIMMIE'S, | No. C 04-03321 WHA |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| CITY OF OAKLAND, OAKLAND POLICE DEPARTMENT, JERRY BROWN, individually and as MAYOR OF THE CITY OF OAKLAND, EDWARD POULSON, individually and as COMMANDER OF THE METRO UNIT IN THE OAKLAND POLICE DEPARTMENT, | |
| Defendants. | |

## INTRODUCTION

In this civil-rights action, defendants now move for summary judgment, or in the alternative, for partial summary judgment. As plaintiff has conceded its conspiracy claim under § 1985 and its state law claims, only §§ 1981 and 1983 are now at issue. Because plaintiff has failed to demonstrate that there are triable issues of material fact, this motion is **GRANTED**.

## STATEMENT

Plaintiff Jimmie's Limousine Service, Inc. ("Jimmie's") is a California corporation doing business since 1987 "as an entertainment complex on a 10,800 square foot parcel at 1731 San Pablo Avenue/577 18th Street, Oakland, consisting of a main brick two-story building housing a nightclub/cabaret, a patio, a banquet room and restaurant" (Compl. ¶ 4). Its president

1  Jimmie Ward and other principals are African-American, as are the majority of the clientele
2  (*ibid.*).  Defendants are collectively alleged to have discriminated against plaintiff on the basis
3  of race.
4      In January 2002, a new development project was approved in an area of downtown
5  Oakland adjacent to Jimmie's (Hillmer Depo. 24:11–13).  The parties agree that in 2001, City
6  Manager Robert Bobb casually approached Ward's business attorney George Holland about
7  purchasing Jimmie's (Bobb Depo. 16:9–18:15).  On June 12, 2001, Holland sent a letter to
8  Frank Fanelli, the manager of real estate services for Oakland, offering to sell the property for
9  four million dollars (Fanelli Depo. 9:1–18).  In January of 2002, Ward rejected the city's offer
10 of $1.3 million, which was based on an independent appraisal of the property, not including
11 fixtures or equipment (*id.* 11:23–12:19).  Holland believed that "significant improvement had
12 been done to the property, which would have given it a greater value" (Holland Depo.
13 29:17–30:10).  Ward counter-offered three million dollars because "[t]hat's what I determined it
14 was worth," but admits that he never had the property appraised (Ward Depo. 179:11–25).[1]  In
15 his letter of January 9, 2002, Fanelli recommended to Holland that Jimmie's commission its
16 own independent appraisal, but never received a response (Fanelli Depo. 32:4–33:15).
17     Negotiations never went any further.  Bobb further asserts that any perceived threat that
18 the city was planning to take the property would have merely helped Ward claim tax benefits in
19 the event of a sale, but they "never got to the point of negotiations" because the offers were
20 simply too far apart (Bobb Depo. 18:16–19:25).  Plaintiff alleges racial discrimination on the
21 basis that around the same time, the city purchased a nearby "white-owned" Arts and Crafts
22 store at fair market value (Compl. ¶ 16).  But, there was no evidence in the record that the store
23 was either "white-owned" or that it was purchased for fair market value.[2]

---

[1] Jimmie Ward's son David Ward was also deposed, but references to "Ward Depo." in this order refer to the former.

[2] Plaintiff's opposition brief cites to Hillmer's deposition.  When asked how much was paid for the arts and crafts store across from Jimmie's, he responded "I do not recall" (Hillmer Depo. 25:8–9).  Ward himself believed that the arts and craft store sold for $2.7 million, but it is unclear where he got this figure (Ward Depo. 59:12–15).

2

Plaintiff alleges that harassment by city police began in late 2002 and early 2003 (Ward Depo. 108:2–24). Specifically, after a series of incidents in 2002, defendant Lt. Edward Poulson allegedly falsified various police reports (Opp. 12–13)(primarily citing testimony from Keith Jacobs, the head of security at Jimmie's, challenging various factual discrepancies therein). Poulson is also accused of initiating proceedings to revoke Jimmie's cabaret license (although it is undisputed that the cabaret license was never actually revoked) and making negative statements in the Oakland Tribune following shootings in the immediate proximity (Jacobs 20:7–16; Ward Depo. 72:11–13; Holland Depo. 54:13–56:5).

On September 30, 2003, an Alcoholic Beverage Action Team ("ABAT") from the police department conducted a Specialized Multi-Agency Response Team ("SMART") inspection of Jimmie's; at this time, inspectors from the California Department of Alcoholic Beverage Control and Alameda County Health Services found various violations and set a deadline for compliance. Plaintiff had to perform $77,000 in repair work to remedy the violations and the upstairs bar at Jimmie's was closed for two or three weeks but Ward couldn't quantify how much revenue was lost as a result (Ward Depo. 59:17–62:4). Defendants contend that ABAT inspections have occurred at numerous clubs, where the club owners and proprietors were of all races, including African-American, Middle-Eastern, Asian and Caucasian (White Depo. 46:22–71:1).

Throughout 2003 and 2004, defendants have also allegedly blocked street access to Jimmie's to prevent patrons from attending special events; unnecessarily sounded airhorns to disperse crowds after closing (but failed to disperse an unwanted crowd on July 4, 2004); blocked nearby parking lots; ticketed illegally-parked cars belonging to patrons, employees, entertainers and vendors; and conducted video-surveillance of the premises. In addition, plaintiff alleges that in 2003, defendant Poulsen attempted to prevent Jimmie's from hiring off-duty police officers for security. After a meeting with the Chief of Police, it was agreed that Jimmie's could hire two officers whenever needed, but Poulsen allegedly sent five to seven officers at a time and billed Jimmie's for unwanted services (*see generally* Ward Depo. and Jacobs Depo.). By way of comparison, plaintiff points to another nightclub called At

3

Seventeenth, which it alleges has not been subjected to such treatment despite similar cabaret license violations and problems with disorderly patrons (Opp. 13).[3]  While plaintiff broadly asserts that this other nightclub is "not getting the heat from the City and police that Jimmie's is getting," the factual evidence in support merely reflects the fact that Jacobs has never observed similar video-surveillance there (Jacobs Depo. 26:23–27:6).

The complaint, filed on August 13, 2004, alleges (1) a violation of 42 U.S.C. 1981;[4] (2) a violation of 42 U.S.C. 1983;[5] (3) conspiracy in violation of 42 U.S.C. 1985; (4) slander per se in violation of California Civil Code § 46; and (5) interference with prospective economic advantage.  Because plaintiff has conceded its conspiracy and claims under state law, summary judgment is **GRANTED** for defendants on those claims.  This order now addresses whether summary judgment is appropriate with respect to the alleged violations of §§ 1981 and 1983.

## ANALYSIS

### 1. LEGAL STANDARD.

Pursuant to FRCP 56(c), summary judgment is proper where the pleadings, discovery and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  "Credibility determinations, weighing evidence, and drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Ibid.*

---

[3] Plaintiff's opposition brief refers to this other club as "At Seventh," but witnesses referred to it as "At Seventeenth" during depositions.

[4] This section provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. . . . The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

[5] This section provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

Once the moving party meets its initial burden of demonstrating the absence of any genuine issues of material fact, the nonmoving party must "go beyond the pleadings by [its] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (internal quotations omitted). It is not the task of the district court "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Ibid.* Summary judgment for a defendant is appropriate when plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

### 2. STATUTE OF LIMITATIONS.

Defendants correctly argue that the statute of limitations for claims under both 42 U.S.C. 1981 and 1983 is two years. The statute of limitations period for actions arising under § 1983 is governed by the forum state's law for personal injury torts. *Wilson v. Garcia*, 471 U.S. 261, 275–76 (1985). Likewise, the statute of limitations for § 1981 claims is also borrowed from the state statute of limitations for personal injury actions. *Goodman & Luken Steel Co.*, 482 U.S. 656, 661–62 (1987). Prior to January 1, 2003, California Civil Procedure Code § 340(3) established a one-year statute of limitations for such actions. Now, California Civil Procedure Code § 335.1 governs; this section extended the statute of limitations for personal injury torts from one year to two years.

Plaintiff concedes that its § 1983 claim is governed by a two-year statute of limitations, but asserts that the proper statute of limitations under § 1981 is four years. It is true that pursuant to 28 U.S.C. 1658 (a), a four-year statute of limitations applies for civil actions "arising under an Act of Congress enacted after the date of enactment of this section." Section 1658 was enacted on December 1, 1990; thus plaintiff's claim under § 1981 would be subject to the four-year statute of limitations if it arose after that date. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372 (2004). As noted in *Jones*, the basic scope of § 1981 did not change

1  prior to 1991, when the term "make and enforce contracts" was redefined to include the
2  "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of
3  the contractual relationship." 42 U.S.C. 1981(b). This was primarily in response to an earlier
4  Supreme Court decision holding that the original version of § 1981 "did not protect against
5  harassing conduct that occurred after the formation of the contract." *Jones*, 541 U.S. at 373
6  (discussing *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)).

7  In *Jones*, the key question was whether the petitioners' claims of wrongful termination,
8  refusal to discharge and hostile work environment arose under the 1991 revision to § 1981.
9  Because such claims "did not allege a violation of the pre-1990 version of § 1981 but did allege
10  violations of the amended statute," the Supreme Court found that the four-year statute of
11  limitations applied. *Id.* at 383. This, in contrast, is not an employment action. As plaintiff
12  would have been able to assert a violation of the pre-1990 version of § 1981, (if at all), the
13  applicable statute of limitations is two years, not four. Because the complaint was filed on
14  August 13, 2004, plaintiff's claims arising out of alleged acts prior to August 13, 2002, (such as
15  the rejected offer to purchase Jimmie's), are now barred by the statute of limitations.

16  \*       \*       \*

17  Defendants further argue that plaintiff's claims arising from *any* acts during 2002 are
18  time-barred because the statute of limitations was only one year at that time. This argument is
19  rejected. "A rule extending a statute of limitations is procedural in nature and therefore, that
20  application of such a rule to pending cases is acceptable if such application would not 'result in
21  manifest injustice' and there is no 'statutory direction or legislative history to the contrary.'"
22  *Chenault v. United States Postal Service*, 37 F.3d 535, 538 (9th Cir. 1994)(internal citations
23  omitted)(further noting that "a statute of limitations may not be applied retroactively to revive a
24  claim that would otherwise be stale under the old scheme"). When the statute of limitations was
25  enlarged to two years, this extension applied to any claims not already barred — *i.e.*, those
26  arising from acts after January 1, 2002. *See Jordan v. Herrera*, 2003 WL 22668840 at \*3–4
27  (C.D. Cal. Nov. 7, 2003)(finding a § 1983 claim not barred when the limitations period began
28  running on January 25, 2002, but the claim was still pending at the time California Civil

6

Procedure Code § 335.1 went into effect). Accordingly, plaintiff's claims arising from acts on or after August 13, 2002 are not time-barred.

### 3. 42 U.S.C. 1981.

Defendants do not dispute that "if a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981." *Thinket Ink Info. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004). Still, an action under § 1981 requires proof of intentional racial discrimination. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982).

To the extent that plaintiff asserts a violation of this section on the basis of the city's alleged refusal to purchase Jimmie's, this claim is time-barred. Even if it wasn't, plaintiff proffered no basis for its assessment that $1.3 million was not a fair offer. Ward merely "felt" that Jimmie's was worth at least $3 million. He never sought an appraisal.

Defendants argue that this claim must fail because a cabaret license is not a contract (Reply Br. 8–9). Even assuming this is true, however, § 1981 also provides that all persons "shall be subject to like punishment, pains, penalties, taxes, *licenses*, and exactions of every kind, and to no other," regardless of race (emphasis added). Theoretically, if the evidence showed that establishments owned by African-Americans were forced to jump through more hoops than "white-owned" establishments to obtain or maintain cabaret licenses, this would be sufficient to survive summary judgment. This order declines to find that plaintiff's § 1981 claim fails for this reason.

Where plaintiff's claim fails, however, is the complete lack of evidence in the record that any allegedly different treatment of Jimmie's was caused by purposeful racial discrimination. Plaintiff's opposition brief is replete with broad assertions, but these are generally unsupported (or under-supported) by the factual record. Even viewing the facts in the light most favorable to the non-movant, there is insufficient evidence for a jury to draw that conclusion. There is no direct evidence of racial animus. There is no evidence of how many or which other cabarets or nightclubs are owned by minorities. There is no evidence of what kinds

1  of police enforcement actions (or lack thereof) are taken at other nightclubs.  Plaintiff has
2  pointed to no evidence, aside from conclusory opinions proffered by Ward's attorneys, of a
3  pattern of disparate treatment motivated by racial animus.  It is not the Court's responsibility to
4  rummage through the record on plaintiff's behalf.  *Carmen v. San Francisco Sch. Dist.*, 237
5  F.3d 1026, 1031 (9th Cir. 2001).
6  At best, plaintiff offers speculation that another nightclub, At Seventeenth, was treated
7  more favorably, but fails to demonstrate that it is "white-owned" or that the race of the owner
8  was the reason for any actual difference in treatment.  The *only* evidence in the record on this
9  issue suggests that the owner of that club is, in fact, an African-American woman (White Depo.
10 at 70:9-21).  Without any evidence to support a finding of liability under § 1981, defendants'
11 motion for summary judgment is **GRANTED** as to this claim.

**4.     42 U.S.C. 1983.**

New theories may not be raised to defeat summary judgment.  "[A]dding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under the second theory of liability."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).  Both in the opposition brief and at oral argument, plaintiff's counsel proffered a plethora of new allegations and theories of liability, which are unsubstantiated by the factual record (and bewildering to the Court).  For example, while the brunt of plaintiff's allegations seemed to revolve around a theory of racial discrimination, counsel insisted at the hearing that the equal protection violation was due to disparate treatment on *non-racial* grounds.  Plaintiff never moved to amend its complaint with these new theories of liability under § 1983.  Discovery ended months ago; the trial is only two months away.  Allowing new theories of liability at this late stage of litigation would prejudice defendants.

The complaint only alleged violations of plaintiff's substantive and procedural due process rights, right to equal protection of the laws, and right to assemble (Compl. ¶ 49).  At oral argument, plaintiff's counsel argued that the reference to the due process clause incorporated the entirety of the Bill of Rights, such that the recently-raised theories of liability are not "new."  This order disagrees.  Merely mentioning the due process clause does *not* give

8

defendants sufficient notice of all theories of liability arising from alleged violations of plaintiff's constitutional rights. As such, plaintiff's theories of prior restraint and retaliation for filing suit under the First Amendment, unlawful search under the Fourth Amendment and takings (temporary or otherwise) under Fifth Amendment are rejected.

### a. Substantive Due Process.

Plaintiff claims that defendants deprived it of its right to substantive due process, yet fails to clearly identify the factual basis of this theory. The single sentence in plaintiff's opposition brief that is even remotely relevant is an argument that extensive surveillance can be intrusive (Opp. 26). Insofar as plaintiff is attempting to argue that it has a right to privacy, it has failed to sufficiently demonstrate that defendants' alleged video-surveillance violates this right. Summary judgment is **GRANTED** in favor of defendants on this theory of liability under § 1983.

### b. Procedural Due Process.

Plaintiff also asserts that defendants violated its rights to procedural due process. To prevail at trial, plaintiff would have to demonstrate that defendants' wrongful acts deprived it of a liberty interest or property interest without sufficient notice or an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). As elsewhere, plaintiff fails to clearly explain its theory of liability.

Plaintiff argues that defendants "tried to make an end-run around the formal license revocation proceeding . . . by engaging in tactics designed to shut Jimmie's down or make it economically unfeasible for it to continue operating" (Opp. 27). Yet, it is undisputed that Jimmie's cabaret license was *never* revoked. Nor is there any evidence in the record that Jimmie's has ceased operating. Even assuming *arguendo* that the temporary closure of Jimmie's following the ABAT inspection was a denial of procedural due process, defendants would not be liable. Inspectors from California Department of Alcoholic Beverage Control and Alameda County Health Services, *not* city officials, were responsible for closing the upstairs bar and requiring plaintiff to make repairs.

1    Plaintiff also alleges damage to Jimmie's goodwill, but defendant Poulson's allegedly
2 disparaging comments in the Oakland Tribune would not, alone, support a procedural due
3 process violation because reputation alone is not a constitutionally protected liberty or property
4 interest. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 373 (9th Cir. 1999).
5    For all of these reasons, summary judgment on this theory is also **GRANTED**.

### c. Equal Protection.

7    To demonstrate § 1983 liability based on a violation of the Equal Protection clause of
8 the Fourteenth Amendment, "a plaintiff must show that the defendants acted with an intent or
9 purpose to discriminate against the plaintiff based upon membership in a protected class."
10 *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Plaintiff's § 1983 claim under this
11 theory fails for the same reason as its § 1981 claim: lack of evidence as to intentional
12 discrimination on the basis of race. Nor did counsel elaborate on plaintiff's newly-raised theory
13 of disparate treatment on non-racial grounds or cite any evidence in support thereof. Again, this
14 order stresses that it is not the Court's responsibility to cobble together plaintiff's case without
15 assistance from counsel. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.
16 2001). Accordingly, summary judgment is **GRANTED** for defendants as to this theory as well.

### d. First Amendment Rights.

18    Finally, plaintiff argues that defendants have violated its First Amendment right to
19 assembly and expressive association. "[I]mplicit in the right to engage in activities protected by
20 the First Amendment a corresponding right to associate with others in pursuit of a wide variety
21 of political, social, economic, educational, religious, and cultural ends." *Roberts v. United*
22 *States Jaycees*, 468 U.S. 609, 622 (1984). "The Supreme Court has identified two types of
23 recognized rights of association: (1) intimacy; and (2) 'expressive association' for First
24 Amendment activity. *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 951 (9th Cir.
25 1997)(citation omitted). Yet, "the Constitution does not provide a generalized right to societal
26 association outside the context of expressive association." *Ibid.*
27    Here, even if the alleged conduct (*i.e.*, blocking street access and ticketing illegally
28 parked cars, etc.) prevent persons from congregating at Jimmie's, it is unclear what rights of

10

expression were allegedly being chilled. By plaintiff's own assertion, Jimmie's has always offered a variety of different types of entertainment (including Monday Night football, zydeco, lip-sync, disco, karaoke and live bands); yet, there have been *no significant changes over the years*, with the exception of a decrease in zydeco performances (Opp. 2)(emphasis added).[6] There is no evidence in the record to support a claim that defendants intended to chill zydeco, or other music traditionally enjoyed by African-American clientele. Indeed, plaintiff has failed to proffer any evidence of what types of entertainment are provided by other cabarets that allegedly are (or aren't) subjected to different treatment by the Oakland Police Department. Summary judgment for defendants is also **GRANTED** under this theory of liability.

## CONCLUSION

For these reasons, defendants' motion for summary judgment is **GRANTED**. Judgment will be entered accordingly.

Insofar as this order did not rely upon any evidence to which objections were raised, the Court declines to rule upon those objections. Finally, because further discovery on the internal affairs complaints concerning Poulson will not change this result, plaintiff's Rule 56(f) motion is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 18, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[6] Zydeco is an accordion-based folk musical genre popular in Louisiana and thought to be influenced by traditional Cajun music.